**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

**JUAN FEDERICO RODRIGUEZ,**  :

                 **Plaintiff,**  :

        -against-  :

**COMMISSIONER OF SOCIAL SECURITY,**  :

             **Defendant.**  :

  :

-------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/30/16

**15-cv-6596 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

The plaintiff, Juan Federico Rodriguez, brings this action to reverse a final decision of the defendant, the Commissioner of Social Security (the "Commissioner"), that Rodriguez was not entitled to Supplemental Security Income benefits ("SSI") or disability insurance benefits ("DIB"). The parties have cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. Rule 12(c). For the reasons stated below, the Commissioner's motion is GRANTED and Rodriguez's motion is DENIED.

## BACKGROUND

**I.     Procedural Background**

Rodriguez filed an application for SSI and DIB on September 14, 2012, alleging that his disability began on September 19, 2011. (A.R. 13.)[1]  His application was initially denied on December 5, 2012. (A.R. 112-13.) He filed a written request for a hearing, and after a hearing held on March 6, 2014, an ALJ denied Rodriguez's application on April 10, 2014, finding that he was not disabled. (A.R. 10-13.) Rodriguez requested review of the ALJ's decision by the Appeals Council. (A.R. 9.) On June 26, 2015, the Appeals Council denied his request for review

---

[1] "A.R." refers to the administrative record prepared by the Social Security Administration (ECF No. 12).

and the ALJ's decision became the final decision of the Commissioner of Social Security. (A.R. 1.) Rodriguez filed this civil action on August 20, 2015, and moved for judgment on the pleadings on January 11, 2016. (ECF Nos. 1, 15.) The Commissioner cross-moved for judgment on the pleadings on June 23, 2016. (ECF No. 26.)

## II.   Factual Background

Rodriguez was born on November 9, 1961, and he was 49 years old at the time of his alleged disability onset date. (A.R. 53, 166.)

### A.   Non-Medical Evidence

#### 1.   Disability Report

In a disability report completed for his benefits applications, Rodriguez reported that he could speak and understand English, and could write more than his name in English. (A.R. 169.) He reported that he had finished the twelfth grade but had not completed any specialized job, trade, or vocational school. (A.R. 171.) He worked from 1996 to 2011 for a fast food business and then as a taxi driver. (A.R. 171.) He alleged disability since September 19, 2011, due to hemorrhoids, depression, memory loss, and a renal mass. (A.R. 170.) Later, he claimed a change in his conditions, to include dizzy spells and balance problems, beginning in December 2012. (A.R. 180.)

#### 2.   Testimonial Evidence

Rodriguez testified at his hearing with the ALJ on March 6, 2014, with the assistance of a Spanish interpreter. (A.R. 32-33.) He testified as follows.

At the time of the hearing, Rodriguez lived in the Bronx in an apartment with his wife and two grown children. (A.R. 35.) He graduated from high school in the Dominican Republic. (A.R. 46.) He previously worked at Domino's Pizza, making deliveries, driving, and taking

orders, and in that position, he spoke a little English with customers. (A.R. 47.) He subsequently worked as a taxi driver in Rockland County, but in this capacity, he did not speak to the passengers, as a taxi service arranged all the fares. (A.R. 46-47.) At the time of his hearing, he still had a commercial driver's license and was able to drive his car to the doctor and to other appointments, and on errands. (A.R. 35-36.)

However, Rodriguez testified, he suffered impairments that prevented him from driving a taxi any longer. (A.R. 37.) He had a cancerous growth removed from his kidney, and though his cancer was in remission at the time of the hearing, he claimed to experience pain, fatigue, dizziness, and memory loss after the kidney's removal. (A.R. 37-38.) In particular, he claimed pain on his right side about twice a month, especially when it rained. (A.R. 38.) He stated that he could only walk a few blocks before feeling a "pull sensation" in his right side. (A.R. 50.) As a result, he testified, he needed to rest or lie down during the day. (A.R. 50.) He also suffered from dizziness once or twice a week for short periods of time, but the dizziness had improved since he began taking medication. (A.R. 40-41, 46.) Rodriguez denied that the dizziness had resolved entirely and attributed any notations in his medical record to the contrary to misunderstandings. (A.R. 46.) He testified that due to a fear of dizziness, he never went anywhere without his wife or son. (A.R. 51.) Despite this, he testified that he had no prsent intent to give up his driver's license. (A.R. 41.) In terms of medication, Plaintiff took testosterone for his kidneys, as well as Tylenol for pain about twice a month. (39, 44.) He had been prescribed Donepezil and Meclizine for memory difficulties. (A.R. 44.)

In addition to physical ailments, Rodriguez stated that he had depression and mood disorders beginning after his kidney surgery. (A.R. 42.) About eight months prior to the hearing, he started mental health therapy. (A.R. 42.) While Rodriguez did not want to take medications,

3

because of his kidney issues, he had tried home remedies like valerian and chamomile at his therapist's recommendation, and found these to help, particularly with nightmares. (A.R. 43.) Rodriguez testified that he continued to experience memory problems; for instance, he forgot his wedding anniversary and required his wife's assistance in remembering medication and appointments. (A.R. 48-49.)

### B.   Mental Health Evidence

#### 1.   Consultative Physician Dr. David Mahoney

Rodriguez met with Dr. David Mahony on October 23, 2012, for a consultative examination. (A.R. 389-92.) Rodriguez drove himself to the evaluation. (A.R. 391.) He reported that he dressed, bathed, and groomed himself, that he socialized with his wife, and that he spent a lot of time at home. (A.R. 391.) He reported that his wife did all of the household work. (A.R. 391.) Dr. Mahony noted that Rodriguez appeared to be his stated age, and displayed normal gait, posture, and motor behavior. (A.R. 390.) He also noted that Rodriguez made appropriate eye contact, spoke fluently and clearly, used adequate expressive and receptive language, and showed coherent and goal-directed thought processes with no evidence of hallucinations, delusion, or paranoia. (A.R. 390.) Rodriguez did display a depressed affect and dysthymic mood, and his attention and concentration appeared mildly impaired due to cognitive limitations. (A.R. 391.) His recent and remote memory skills were impaired due to symptoms of depression, and cognitive functioning seemed below average; he could recall three out of three objects immediately, but two out of three after five minutes. (A.R. 391.) But his general fund of information was appropriate to experience, and his insight and judgment were good. (A.R. 391.)

Dr. Mahony diagnosed Rodriguez with major depressive disorder, moderate and cognitive disorder, NOS. (A.R. 391.) In his opinion, Rodriguez could follow and understand

simple directions and instructions, and perform simple tasks independently, but he would have moderate difficulties maintaining attention and concentration, maintaining a regular schedule, learning tasks, performing complex tasks, making appropriate decisions, relating to others, and dealing with stress. (A.R. 391.)

### 2. Psychological Consultant Dr. T. Harding

On December 4, 2012, psychiatric consultant Dr. T. Harding submitted an evaluation of Rodriguez's mental impairment based on a review of Rodriguez's medical records. He found that Rodriguez had moderate limitations in understanding, remembering, and carrying out detailed instructions, performing activities within a schedule, maintaining a regular schedule, being punctual within a customary tolerance, and responding appropriately to changes in the work setting. (A.R. 49-54.) He concluded that Rodriguez retained his ability to perform unskilled work. (A.R. 53-64.)

### 3. Treating Therapist Rose Silfa

On February 12, 2013, Rose Angelica Silfa, a social worker, submitted a medical source statement. (A.R. 404-06.) She stated that she saw Rodriguez individually for psychotherapy. (A.R. 404.) She noted that Rodriguez arrived late to appointments and attended the appointments unscheduled (A.R. 405.)

She claimed that Rodriguez's impairments began on October 15, 2012. (A.R. 405.) On the form, she indicated that Rodriguez had moderate limitations in carrying out simple instructions and the ability to make judgments on simple work-related decisions, and marked limitations in understanding and remembering simple and complex instructions, carrying out complex instructions, and the ability to make judgements on complex work-related decisions. (A.R. 404). Ms. Silfa indicated that he was very forgetful and things had to be repeated several

5

times. (A.R. 404.) She noted that he was depressed, and had "much anxiety" and poor concentration and focus, but that he had no limitations in interacting appropriately with the public, supervisors, and co-workers. (A.R. 404-05.) She did note that he had a marked limitation in responding appropriately to usual work situations and changes in a routine work setting (A.R 405.) But she denied that Rodriguez's impairments affected any other capabilities. (A.R. 405.)

Ms. Silfa completed another assessment on February 25, 2014. (A.R. 511-15.) She indicated she had seen Rodriguez on a biweekly basis since October 15, 2012. (A.R. 511.) She opined that Rodriguez had a global assessment of functioning of 55, and that he had poor memory, sleep disturbance, difficulty thinking or concentrating, decreased energy, and generalized persistent anxiety. (A.R. 511.) However, Rodriguez did not have a low I.Q. or reduced intellectual functioning. (A.R 512.) She opined that Rodriguez would miss work twice a month due to her impairments or treatment and that Rodriguez had a moderate loss in his ability to remember locations and work-life procedures, understand, remember, and carry out very short, simple instructions as well as marked losses many other areas. (A.R 512.)

### C.    Physical Health Evidence

#### 1.    Consultative Physician Dr. John Fkiaras

Rodriguez met with Dr. John Fkiaras on October 23, 2012, for a consultative examination. (A.R. 393-96). He told Dr. Fkiaras that he could shower and dress daily, that he shopped once a week, and that he read, watched television, and listened to the radio. (A.R. 394.) Rodriguez reported that in 2011, his left kidney was removed after a cancer diagnosis. (A.R. 393.) He reported that he had not had any radiation or chemotherapy treatment. (A.R. 393.) But he claimed fatigue since his kidney cancer diagnosis, in particular when walking more than four blocks, climbing up more than two flights of stairs, or lifting more than 25 pounds. (A.R. 393.)

6

In addition, Rodriguez reported that he had been diagnosed with a left inguinal hernia in October 2012 and that he had to follow up with a surgeon to determine if surgery was necessary, and that he had thyroid nodules and had an appointment in November 2012 for a thyroid biopsy. (A.R. 393.) Finally, Rodriguez claimed a history of hemorrhoids, and associated pain, since 2009. (A.R. 393.) Rodriguez's reported medications included hydrocortisone suppository, nitroglycerin ointment, omeprazole, Ambien, ibuprofen, and Sertraline. (A.R. 393-94.)

Dr. Fkiaras observed that Rodriguez did not appear to be in acute distress. (A.R. 394.) He walked with a normal gait, and though he was unable to walk on his heels, he could walk on his toes and perform a full squat. (A.R. 394.) Rodriguez had a normal stance and used no assistive devices, and he needed no help changing for examination or getting on and off the examination table, and he could rise from a chair without difficulty. (A.R. 394.)

Dr. Fkiaras noted that Rodriguez had a six-centimeter surgical scar in the left lower quadrant of his abdomen with no significant adenopathy. (A.R. 394.) However, abdominal examination showed normal bowel sounds, a soft, nontender abdomen, no hepatosplenomegaly or masses, and no abdominal bruits. (A.R. 395.) Dr. Fkiaras diagnosed a history of left kidney cancer, a history of left kidney removal, hemorrhoids, left inguinal hernia, and thyroid nodules. (A.R. 395.) He found Rodriguez to be restricted from activities requiring moderate or greater exertion secondary to the fatigue associated with his history of left kidney cancer and surgical removal of the left kidney. (A.R 396.)

### 2.  Medical Consultant Dr. R. Gauthier

On November 28, 2012, state medical consultant Dr. R. Gauthier submitted an evaluation based on a review of Rodriguez's medical records. (A.R. 58). Dr. Gauthier found that Rodriguez had a fully resected renal cancer that had not spread outside the kidneys. (A.R. 58.) He reported

that there were no other complications, and that Rodriguez did not complain of fatigue or other problems related to the surgery. (A.R. 58.) He concluded that Rodriguez had no exertional limitations. (A.R. 58.)

### 3.    Medical Records

Rodriguez visited Good Samaritan Hospital on September 26, 2011, presenting with gross hematuria as well as a left renal mass. (A.R. 211.) His left kidney was removed laparoscopically and he was discharged on October 2, 2011. (A.R. 211.) He was prescribed Zofran as needed, as well as Levaquin, Colace, and Percocet. (A.R. 211.)

On March 5, 2012, Rodriguez visited Dr. Tushar Shah, complaining of dizziness and a dry cough. (A.R. 273.) The examination resulted in normal findings, and Dr. Shah noted that Rodriguez did not demonstrate mood swings or memory loss. (A.R. 274, 283.) Rodriguez underwent an EEG, which showed normal results, as well as autonomic nervous system testing, which showed possible mild autonomic dysfunction. (A.R. 264, 268.) Rodriguez was referred for bloodwork, which showed largely normal results and an absence of malignant disease. (A.R. 261-63, 272-72, 330-31.) That month, Dr. Shah diagnosed malaise or fatigue. (A.R. 283.) Rodriguez visited Dr. Shah again on April 12, 2012, complaining of a headache, and denied dizziness or weakness; again, findings were normal. (A.R. 284-85.) In visits to Dr. Shah throughout June, July, and August, Dr. Shah continued to indicate normal findings with no memory loss. (*See* A.R. 294-382.) On August 30, 2012, Rodriguez complained of sleeplessness but again denied dizziness. (A.R. 311.) He complained of an "unspecified" backache, and Dr. Shah suggested that he moderate physical activities and avoid heavy lifting. (A.R. 310.)

On May 12, 2012, Rodriguez visited Weiler Hospital for rectal pain and bleeding; he was found to have hemorrhoids and was treated and released in good condition. (A.R. 239, 247.) On

September 24, 2012, Rodriguez visited a gastroenterologist for heartburn and hemorrhoids, and the doctor prescribed a colonoscopy. (A.R. 332.)

On September 17, 2012, Rodriguez visited Dr. Shah, after he fell down due to dizziness. (A.R. 313.) Examination showed normal results, as did an MRI taken in October. (A.R. 327-28.) A video ENG, performed on December 11, 2012, revealed no evidence of significant peripheral vestibular dysfunction, but it did reveal evidence of significant central vestibular dysfunction. (A.R. 442.) As a result, Dr. Shah referred Rodriguez to physical therapy to treat dizziness, twice a week, for six weeks. (A.R. 401.)

In January 2013, Rodriguez visited Dr. Sana Bloch at Medalliance Medical Health Services, reporting dizziness when he rose from a seated position. (A.R. 438.) At that examination, his memory loss was reported stable with the use of Aricept, and he showed instant recall of three out of three and five-minute recall of two out of three. (A.R. 438.) His gait was mildly ataxic, and exaggerated on tandem gait. (A.R. 438.)

On March 11, 2013, after Rodriguez started a program of balance training, Dr. Bloch noted that Rodriguez reported feeling "much better now." (A.R. 437.) At that time, he was taking Aricept for his memory and doing well, and an examination of cranial nerves and ocular movements revealed normal results. (A.R. 437.) However, he still showed mild difficulty with tandem gate. (A.R. 437.)

By June 11, 2013, Dr. Bloch noted that Rodriguez's dizziness had "resolved completely" and that he was "doing well in that sense." (A.R. 424.) She noted that Rodriguez attended physical therapy and balance training. (A.R. 424.) But she also noted that Rodriguez expressed concerns about cognitive problems, in particular, loss of short-term memory. (A.R. 424.) On examination, she found him to be alert and able to follow commands. (A.R. 424.) He again could

recall three out of three objects immediately, and two out of three after five minutes. (A.R. 424.) Dr. Bloch wrote that Rodriguez "noticed mild cognitive impairment, somewhat progressing from previous visit," and "central vertigo, presently stable." (A.R. 424.) She compared his test results with prior results from November 2012, and found that his global cognitive score had improved from 87.7 to 91.5, though his executive function and attention had both decreased slightly. (A.R. 408.)

On January 14, 2014, Dr. Bloch saw Rodriguez again and noted that the testing from June 2013 confirmed a cognitive impairment and that a video ENG from December 2012 showed central vestibular dysfunction. (A.R. 481.) Rodriguez complained of nightmares and difficulty sleeping. (A.R. 481.) He was on an increased dose of Aricept. (A.R. 481.) However, Dr. Bloch linked the nightmares to the Aricept, so Rodriguez was switched to an Excelon dermal patch. (A.R. 481.) Dr. Bloch noted that Rodriguez stated his dizziness was "very infrequent" and that he considered it "resolved." (A.R. 481.)

## DISCUSSION

### I.    Legal Principles

#### A.    Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). It is "a very deferential standard of review—even more so than the 'clearly erroneous' standard."

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012). "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error." *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 566 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

### B.   Determination of Disability

To establish a disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability at issue must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner of Social Security has promulgated regulations that set forth a five-step sequential evaluation process to guide disability determinations." *Cichocki v. Astrue*, 729 F.3d 172, 174 n. 1 (2d Cir. 2013) (internal citation omitted). The Second Circuit has described this process as follows:

> [1.] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2.] If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.
>
> [3.] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4.] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity[2] to perform his past work.

[5.] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (alterations omitted) (footnote added).

"The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Id.* (citations omitted). "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005) (quoting *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).

### C.    The ALJ's Decision

In his decision, the ALJ evaluated Rodriguez's claims for benefits pursuant to the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. (A.R. 10-25.) First, the ALJ found that Rodriguez met the insured status requirements of the Social Security Act and that he had not engaged in substantial gainful activity since September 19, 2011, the alleged onset date. (A.R. 15.) Second, the ALJ found that Rodriguez had the following severe impairments: s/p nephrectomy, mild cognitive impairment, and mood disorder. (A.R. 15.) Third, the ALJ determined that Rodriguez's impairments or combination of impairments did not meet or

---

[2] "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments. In assessing the residual functional capacity of a claimant with multiple impairments, the SSA considers all his medically determinable impairments including medically determinable impairments that are not severe." *Selian*, 708 F.3d at 418 (citing 20 C.F.R. § 404.1545) (internal citations, quotation marks, and alterations omitted).

medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 16.) Fourth, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant also has non-exertional limitations. He is limited to unskilled work. The claimant can understand, carry out, and remember simple instructions. He can respond appropriately to supervision, coworkers, and usual work situations. The claimant can deal with changes in a routine work setting.

(A.R. 18.)

In determining Rodriguez's RFC, the ALJ found that while Rodriguez's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and effects of those symptoms were not entirely credible. (A.R. 19.) This was so because Dr. Shah, the treating physician, consistently reported a normal physical examination and because Rodriguez reported to Dr. Bloch that his dizzy spells had resolved. (A.R. 19-20.) The ALJ also noted that he did not credit Rodriguez's reported changes in his activities of daily living—i.e. an inability to carry objects—given Dr. Shah's examinations and Rodriguez's responses to physical therapy. (A.R. 20.)

As to the various physicians' opinions on Rodriguez's physical health, the ALJ gave little weight to the opinion of Dr. Fkiaras, who noted greater impairments than Dr. Shah, as Dr. Fkiaras's opinion was not compatible with Dr. Shah's treatment notes and Dr. Fkiaras based his opinion on Rodriguez's complaints rather than a physical examination. (A.R. 20.) But the ALJ also rejected the opinion of Dr. Gauthier, the state medical consultant, who found *no* physical limitations, as the ALJ "fully considered the claimant's symptoms, including his dizziness and fatigue." (A.R. 20.)

As to Rodriguez's mental health, the ALJ noted that tests in November 2012 and June 2013 showed global cognitive functioning scores of 87.7 and 91.5, and found that the clinical

findings documented by medical sources failed to support significant or disabling restrictions in Rodriguez's cognitive functioning. (A.R. 21.) The record supported the presence of mild cognitive impairment and a mood disorder, but the mood disorder could not be found to be disabling, given the lack of psychiatric treatment and the reported effectiveness of home treatments. (A.R. 21.) Finally, the ALJ gave little weight to the opinion of Ms. Silfa, the social worker, as her reports were at odds with the clinical findings of Dr. Mahony and Dr. Bloch. (A.R. 21-22.) In particular, the ALJ rejected her assertion that Rodriguez had moderate difficulties in his capacity to understand, remember, and carry out simple instructions, given the clinical findings reported. (A.R. 22.) The ALJ, however, gave "great weight" to the opinion of state consultative examiner Dr. Harding, specifically that Rodriguez had moderate limitations in his ability to understand, remember, and carry out detailed instructions, and to respond appropriately to changes in the work setting, as this opinion was consistent with those of Drs. Bloch and Mahony. (A.R. 22.)

After determining Plaintiff's RFC, the ALJ found that Rodriguez was not able to perform past relevant work as a taxi driver. (A.R. 23.) Finally, at Step Five, the ALJ determined that, considering Rodriguez's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Rodriguez can perform. (A.R. 24.) The ALJ found:

> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of 'not disabled' would be directed by Medical Vocational Rule 201.18. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of 'not disabled' is therefore appropriate under the framework of these rules.
>
> The additional mental restrictions do not erode the light occupational base, since the claimant retains all the mental abilities necessary to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond

14

appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

(A.R. 24 (citation omitted).) Accordingly, the ALJ concluded that Rodriguez has not been under a disability as defined in the Social Security Act from September 19, 2011, through the date of the decision. (A.R. 24.)

## II.    Analysis

Rodriguez argues that the ALJ erred by: (1) failing to assess his claim as a borderline claim despite his proximity in age to a different age bracket; and (2) relying on the grids rather than a vocational expert.

### I.    The ALJ's Failure to Assess Rodriguez's Claim as a Borderline Claim

When making a disability determination, an ALJ must "consider [the claimant's] chronological age in combination with [his] residual functional capacity, education, and work experience." 20 C.F.R. § 404.1563(a). Because the SSA considers "advancing age to be an increasingly limiting factor in the person's ability" to adjust to other work, *id.*, the grids provide for three distinct age categories: (1) "younger person," meaning an individual between the ages 18 and 49; (2) "person closely approaching advanced age," meaning an individual between the ages 50 and 54; and (3) "person of advanced age." meaning an individual 55 years of age and over. 20 C.F.R. §§ 404.1563(c)-(e). "The distinction between being classified as a 'younger person' and being classified as a 'person closely approaching advanced age' can be dispositive in determining whether an individual qualifies as disabled." *Grace v. Astrue*, No. 11 Civ. 9162 (ALC) (MHD), 2013 WL 4010271, at *24 (S.D.N.Y. July 31, 2013).

The application of the age categories should not be rigid, and instead, the Regulations instruct:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b); *see also Grace*, 2013 WL 4010271, at *24 ("[C]ase law focusing on this issue is decisive. Mechanical application of the age criteria is not appropriate in borderline cases." (alteration and citation omitted)). "Although the regulations do not clearly define the outer limits of a borderline situation, several courts have held that a period of up to six months is within the rule . . ." *Koszuta v. Colvin*, No. 14 Civ. 694, 2016 WL 824445, at *2 (W.D.N.Y. Mar. 3, 2016) (internal quotation marks and citation omitted); *see also id.* (collecting cases).

The ALJ found that Rodriguez "was born on November 9, 1961, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date." (A.R. 23.) He continued, "The claimant subsequently changed age category to closely approaching advanced age." *Id*. This change in age category occurred less than two months after the alleged disability onset date of September 19, 2011, as Rodriguez turned fifty on November 9, 2011.

Rodriguez argues that the ALJ failed to comply with the Regulations by failing to consider whether to use the older age category in a "borderline situation" where using the older age category would result in a determination that Rodriguez was disabled. Specifically, he argues that had the ALJ used the older age category of "person closely approaching advanced age," the ALJ would have found him to be disabled pursuant to Section 201.14 of the Medical-Vocational Guidelines, which provides that an individual within that age category is disabled if he has a high school education or more that does not provide for direct entry into skilled work, is limited to sedentary work, and has no transferable skills. 20 C.F.R. Pt. 404, Subpt. P. App. 2.

The ALJ here concluded that Rodriguez has the residual functional capacity to "perform light work," and that he is "limited to unskilled work." (A.R. 18.) Regardless, because Section 201.14 applies to individuals who can only perform *sedentary* work—rather than *light* work—Rodriguez's argument that the ALJ would have found him disabled had the ALJ used the older age category holds true only if the ALJ erred in finding Rodriguez capable of "light work."

"Light work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours." *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) (citation omitted). Rodriguez first argues, relying on Dr. Fkiaras's assessment, that he was not physically capable of performing light work. However, the ALJ's finding that Rodriguez's physical ailments allowed him to perform light work was, as the ALJ noted, supported by objective evidence of physical examinations at which other physicians consistently reported normal findings. (*See, e.g.*, A.R. 274, 279, 327-328, 347-49.) Despite Dr. Fkiaras's report and Rodriguez's own testimony, contemporaneous medical records reflect that Rodriguez's issues with dizziness were improving. (*See, e.g.*, A.R. 424, 437, 481.) And Dr. Fkiaras himself reported a number of normal findings, for instance, that Rodriguez walked with a normal gait, could perform a full squat, and needed no help changing for the examination or getting on or off the table. (A.R. 394.) Taken together, these medical records and doctors' reports provide "more than a mere scintilla" of evidence and indeed constitute "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion" that Rodriguez could physically perform light work. *See Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (citation omitted).

Rodriguez next argues that even if his physical condition, standing alone, would not prevent him from performing light work, his physical condition in combination with his mental

condition does prevent him from doing light work. Again, however, Rodriguez leans heavily on the opinion of a source that is in conflict with much of the other evidence in the record. Here, he points to the opinion of the treating social worker, Ms. Silfa, and faults the ALJ for relying too heavily on the opinion of consultative expert Dr. Harding. But again, the ALJ's assessment was supported by substantial evidence. Rodriguez consistently visited Dr. Shah over the course of many months, and Dr. Shah consistently noted an absence of mood swings and memory loss. (*See*, e.g. A.R. 296-97, 298-99, 306-07, 342-43.) Dr. Bloch's reports, too, support the ALJ's findings; for instance, while Dr. Bloch noted some memory impairment, she found his global functioning score to be increasing. (A.R. 408.) Finally, Dr. Mahony reported that Rodriguez appeared his stated age, made appropriate eye contact, was coherent and goal-oriented, and exhibited only mildly impaired attention and concentration. (A.R. 391.)

While Dr. Harding's opinion alone would likely not provide substantial evidence to support the RFC here, *see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (noting that consultative physician opinions should generally be given "limited weight"), it is buttressed by the objective evidence of long-term treatment providers. In contrast, while Rodriguez urges that greater weight be given to Ms. Silfa's opinion, Ms. Silfa is not an acceptable medical source and her opinion is contradicted by contemporaneous records. *See Assenheimer v. Comm'r of Soc. Sec.*, No. 13 Civ. 8825 (ER) (SN), 2015 WL 5707164, at *4 (S.D.N.Y. Sept. 29, 2015) ("[T]he ALJ was not required to afford [the social worker's] opinion the weight of a treating physician's because social workers are not among the five '[a]cceptable medical sources' who can provide evidence to establish an impairment. . . . [E]ven if [the social worker] were to be considered a treating physician, the opinion of a treating physician is not binding if it is contradicted by substantial evidence." (citations omitted)), *appeal dismissed* (Apr. 15, 2016).

The records of Drs. Bloch and Shah provide substantial evidence that Rodriguez can perform light work despite the three additional counterexamples cited by Rodriguez: (1) the ALJ's apparent frustration with Rodriguez at the hearing;[3] (2) the ALJ's reference to a global functioning score of 91.5 as within a normal range; and (3) the ALJ's focus on Dr. Harding's positive assessments of Rodriguez, rather than his more cautious assessments. As to the first counterexample, the transcript is too ambiguous for the Court to definitively state that any mental limitations were to blame for the contentious exchange between the ALJ and Rodriguez, rather than, for example, language or interpreter difficulties. As to the second counterexample, the ALJ stated that Rodriguez's global functioning scores "do not reveal significant limitations," and noted that the score of 91.5 was "in the normal range." (A.R. 20-21.) Despite Rodriguez's protestations, a score of 91.5 is, in fact, within the highest possible score range. *See* American Psychiatric Ass'n, *Diagnostic and Statistic Manual of Mental Disorders* 34 (4th ed. 2000) (score of 91 to 100 indicates "superior functioning in a wide range of activities.") Finally, as to the third counterexample, even crediting those limitations noted by Dr. Harding that the ALJ allegedly overlooked—that Rodriguez would have *moderate* limitations in his ability to perform activities within a schedule, maintain a regular schedule, and be punctual—these limitations would not *preclude* Rodriguez from performing light work. *See, e.g, McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (upholding ALJ's conclusion that claimant's impairments "did not preclude her from light work, subject to specified modifications," where claimant had "'moderate difficulties' with regard to social functioning and 'concentration, persistence or pace'"); *Laguerre v. Comm'r of Soc. Sec.*, No. 13 Civ. 6747 (JCF), 2014 WL 7373435, at *10 (S.D.N.Y. Dec. 29, 2014) (substantial evidence to support RFC to perform full range of light work, where "the ALJ

---

[3] *See* A.R. 44 (ALJ addressing Rodriguez: 'You know, you know what we're doing now, we're all over the, we're all over the place because he didn't listen to me and just answer the question." Rodriguez: "I'm sorry.").

examined the records of her treating and consultative examiners and assessed only moderate [nonexertional] limitations, at most.").

For all of these reasons, the determination that Rodriguez could perform light work is supported by substantial evidence. Therefore, the ALJ need not have considered Rodriguez as a "borderline" case, because even if Rodriguez had been considered in the older age category of "person closely approaching advanced age," the ALJ would not have found him to be disabled. That is, since there was substantial evidence that Rodriguez could perform light work rather than sedentary work, Rodriguez would not have been found to be disabled regardless of the age category used.

## II.   The ALJ's Reliance on the Grids, Rather Than a Vocational Expert

Second, Rodriguez argues that the ALJ erred in making his Step Five determination—that Rodriguez had the RFC to perform substantial gainful work in the national economy—based solely on the grids, rather than relying on a vocational expert.

At Step Five, the ALJ has the burden of proving that the claimant has "a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). Though the ALJ may ordinarily meet this burden by relying on the applicable medical vocational guidelines, "sole reliance on the guidelines may be inappropriate where the claimant's exertional impairments are compounded by nonexertional impairments." *Id.* The presence of nonexertional impairments alone does not require the testimony of a vocational expert; instead, such testimony is required only when "a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'" *Bapp*, 802 F.2d at 605 (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir.

1983)). "A nonexertional impairment significantly limits a claimant's range of work when it causes an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Doria v. Colvin*, No. 14 Civ. 7476 (KPF), 2015 WL 5567047, at *10 (S.D.N.Y. Sept. 22, 2015) (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2011)) (internal quotation marks and alterations omitted).

Here, the ALJ found that Rodriguez had nonexertional limits. He found that Rodriguez had the RFC to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b)," but that "[t]he claimant also has non-exertional limitations. He is limited to unskilled work." (A.R. 18.) He continued on, "The claimant can understand, carry out, and remember simple instructions. He can respond appropriately to supervision, coworkers, and usual work situations. The claimant can deal with changes in a routine work setting." (A.R. 18.) He concluded that the nonexertional limitations "have little or no effect on the occupational base of unskilled light work," as under SSR 85-15 "[t]he basic mental demands of competitive, remunerative unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting." (A.R. 24.)

The limitations identified by the ALJ here cannot reasonably be expected to cause an additional loss of work capacity beyond a negligible one. *See Zabala*, 595 F.3d at 411. The ALJ noted that despite his nonexertional limitations, Rodriguez could "understand, carry out, and remember simple instructions. He can respond appropriately to supervision, coworkers, and usual work situations," and "deal with changes in a routine work setting," allowing him to meet the requirements of unskilled light work as described by the Regulations.

This sets Rodriguez's case apart from those in which courts have found that the ALJ erred in relying solely on the Grids despite noting substantial nonexertional limitations. *See, e.g.. Williams v. Colvin*, No. 15 Civ. 4173 (ALC), 2016 WL 3034494, at *12 (S.D.N.Y. May 26, 2016) (remanding where claimant was limited to work "performed in a low stress environment, defined as involving only occasional interaction with others."); *Doria*, 2015 WL 5567047, at *10 (remanding where claimant was limited to "only occasional interaction with coworkers and no interaction with the public"); *Ketch v. Colvin*, No. 12 Civ. 1104, 2014 WL 411875, at *3 (W.D.N.Y. Feb. 3, 2014) (remanding where claimant was limited to "work under remote or indirect supervision" and had an "inability to interact with co-workers on more than an occasional basis.") Here, in contrast, there is nothing to indicate that Rodriguez's nonexertional limitations "narrow his range of work as to deprive him of a meaningful employment opportunity," *Doria*, 2015 WL 5567047, at *10. Accordingly, the ALJ was not required to consult a vocational expert.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is GRANTED, and the ALJ's decision is AFFIRMED. The Clerk of the Court is respectfully directed to enter judgment, to terminate ECF Nos. 15 and 26, and to close this case.

**SO ORDERED.**

**Dated**:      September 30, 2016
         New York, New York

                                      **ANDREW L. CARTER, JR.**
                                      **United States District Judge**